J-A09031-21

**NON-PRECEDENTIAL DECISION - SEE SUPERIOR COURT I.O.P. 65.37**

| | | |
|---|---|---|
| C.K. | : | IN THE SUPERIOR COURT OF |
| | : | PENNSYLVANIA |
| Appellant | : | |
| | : | |
| | : | |
| v. | : | |
| | : | |
| | : | |
| T.M. | : | No. 908 WDA 2020 |

Appeal from the Order Entered July 29, 2020
In the Court of Common Pleas of Jefferson County Civil Division at No(s):
1342 CD 2008

BEFORE:  STABILE, J., KUNSELMAN, J., and PELLEGRINI, J.[*]

MEMORANDUM BY PELLEGRINI, J.:                 **FILED: MAY 13, 2021**

C.K. (Mother) appeals from the order entered in the Court of Common Pleas of Jefferson County (trial court) continuing the award of primary physical custody of the parties' minor son, C.B.K. (Child, D.O.B. 4/25/07) to T.M. (Father) and stating its intent to transfer jurisdiction of the case to Saluda County, South Carolina, where Father resides with Child.  We affirm the custody award but remand for further consideration of the transfer issue.

**I.**

The parties never married and were in a relationship for approximately three years, which ended in the fall of 2008.  Early in their relationship, the couple lived together both in Pennsylvania and South Carolina, where Father's

_____

[*] Retired Senior Judge assigned to the Superior Court.

family resides. When Child became school-aged in the fall of 2010, the parties agreed that Mother would have primary custody during the school year. However, on July 31, 2014, the trial court entered an emergency order granting Father primary custody of Child, subject to Mother's periods of supervised partial custody. This custody arrangement was precipitated by Mother's planned move to Texas with her then-boyfriend, although she went to that state for only a short time. Father married D.M. (Stepmother) in 2015 and they have two children together, a daughter and a son born in November of 2011 and March of 2013, respectively.

On January 6, 2015, the parties stipulated to entry of a consent order continuing Father's primary physical custody of Child, subject to Mother's periods of partial physical custody during the summer months and Christmas vacation. The order further provided that Mother exercise custody of Child in her parent's home because she was addicted to pain medication.

On July 11, 2019, Mother filed a petition seeking modification of the consent order and requesting primary physical custody of Child on the basis of a South Carolina Department of Social Services (DSS) investigation alleging an incident of abuse against Child by Stepmother. Prior to the June 23, 2020 custody trial, Father filed a motion *in limine* seeking to preclude evidence relating to the DSS investigation because all parties had consented to its dismissal on March 30, 2020. The trial court granted Father's motion in part

and limited any such testimony to witnesses having first-hand knowledge of the episode.

At the custody trial, Mother testified that she resides with her parents in their home and that she has partial physical custody of her son B.K., Child's half-brother. Mother has steady employment in the deli department of a supermarket where she is provided with a 401(k), health benefits, insurance and flexibility in her schedule. Mother also works as a waitress for additional income. If Child were to live with her during the school year, she anticipated that they would reside in a rental property located in Elk County, Pennsylvania. This residence is close to her parents' home and they would also act as caregivers to Child.

Mother explained that her addiction to drugs began when she was prescribed medication while she was recovering from injuries sustained in a serious car accident in 2003. Mother remained on the medication for years and stopped taking it temporarily when she was pregnant with Child's half-brother. Mother was then in another car accident triggering a relapse of her struggle with opioid addiction. She recounted that her addiction "just went and spiraled out of control, and I got in trouble and went to jail over it. I served my time, learned by lesson, and went to Teen Challenge [rehabilitation program]. I wanted a better life, and now I'm clean." (N.T. Trial, 6/23/20, at 132). Mother explained that she spent 14 months at the rehabilitation facility, from February 2017 through April 2018. Mother acknowledged that

the last time Child attended school while in her primary care was in kindergarten and first grade. During that brief period, Child went to three different schools.

Father testified that he has been employed by Samsung Home Electronics for two and one-half years and that he owns the home that he shares with Stepmother and the children. They live on a five-acre lot in a tight-knit neighborhood and are active members of a local Methodist Church. Father explained that Child would be entering eighth grade in public school in the fall of 2020. Father has had continuous primary custody of Child since July 2014 when Child began second grade.

Father testified that on the day of the incident of abuse involving Stepmother in May 2019, he arrived home from a golf tournament and observed nothing unusual. Their extended family was over for dinner and Father did not notice any injuries to Child or marks on his face. There was no air of anxiety or tension and neither Child nor Stepmother appeared upset in any way or spoke about the incident.

The next morning, Father noticed what looked like a rugburn on Child's neck and Child told him that he had gotten the mark in a bounce house. Later that day, Child was confirmed at church and the family spent the day together doing the activities Child requested, including having lunch in the park and riding his four-wheeler. Child did not seem upset and instead appeared very excited. Late in the day when Stepmother was exhausted and not feeling well,

she and Child watched a movie together and Child made her soup. After Stepmother was feeling better, she told Father about an incident the day before during which she disciplined Child by taking away his tablet because he did not wear a seatbelt and the situation escalated. Father then spoke with Child directly about the episode. Child indicated that he and Stepmother had apologized to one another and were not dwelling on it.

Stepmother testified that Child is generally well-behaved and described him as "outgoing, funny, lovable, caring, full of life." (**Id.** at 309). She stated that Child loves spending time with family and that they have a large extended family in South Carolina. Regarding the DSS incident, she testified that she took away Child's tablet because he didn't wear a seatbelt in the car. When Child used the tablet anyway, she extended the length of the punishment and Child slammed the door to his bedroom. Stepmother testified that Child "started getting in my face, being very disrespectful, and out of reaction, I'm like Get out of my face. . . . Stop breaking stuff in your room. So quick reaction I popped him, but he's bigger than me. It was just a reaction, something I did." (**Id.** at 314).

Afterward, Child "apologized . . . about how he acted. I apologized because I knew that I shouldn't have popped him." (**Id.**). They gave one another a hug and kiss. Child did not appear upset or injured and she did not observe any mark on his face. They went outside and had fun with the extended family. The following evening, she told Father about the incident

and after he spoke to Child, she thought the matter was over. Stepmother testified that she "loved [Child] since the day I met him in 2010. He was actually glued to my side, is what I like to say, and to me, I don't look at [him] like a stepchild. He's part of me. . . . He was my child before I actually had kids of my own . . . [and I love him] just as much." (*Id.* at 325-26).

Stepmother testified that in March 2020, Mother called Child and pressured him to live with her. Child became very sad and started to cry and Stepmother reassured him that although Mother was upset in the moment, she still loved him.

Child testified *in camera* that in May 2019, Stepmother disciplined him for not wearing a seatbelt in the car by taking his tablet away for one day. When Child used the tablet, she increased the length of the punishment to one week and Child went to his room and began to cry. Child testified that Stepmother "whooped my butt. Then she slammed me side to side, put her knuckles in my mouth, slammed me on the bed, took me to the closet, slammed me right to left and then shoved me down on the right side of the closet, took me to the middle of the closet, laid me down, and slapped me three times actually on the face." (*Id.* at 339). He further testified that he cried and screamed "Mom" during the incident and that Stepmother apologized to him and returned his tablet after. (*Id.* at 340). Child reported the incident to school personnel the following day after a teacher noticed a hand mark on his face. Child described other instances of abuse, including

Stepmother throwing a trophy at his leg and another episode during which she threw small matchbox cars at him. Child testified that to his belief, Stepmother gives his younger half-siblings preferential treatment and that he was required to do more household chores.

On July 29, 2020, the trial court entered its order continuing Father's primary physical custody of Child and stating its intention to transfer jurisdiction of this case on its own motion to Saluda County. The court found that Stepmother did commit an act of child abuse, consisting of an open-handed slap with her right hand to Child's left jaw and cheek, leaving a bruise. However, the court concluded that this single act did not warrant transfer of primary custody to Mother, given her prior opioid addiction and criminal history, coupled with the long duration of time Child has spent in South Carolina. (***See*** Trial Court Opinion, 11/13/20, at 1-4). The trial court specifically found Child's testimony concerning the remaining allegations of abuse by Stepmother not credible. (***See id.*** at 2). Mother timely appealed and she and the trial court complied with Rule 1925. ***See*** Pa.R.A.P. 1925(a)(2)(i)-(ii).[1]

---

[1] When presented with child custody matters, we employ the following scope and standard of review:

> Our scope is of the broadest type and our standard is abuse of discretion. This Court must accept findings of the trial court that are supported by competent evidence of record, as our role does not include making independent factual determinations. In

## II.

We begin by observing the precepts governing a trial court's award of custody. "The primary concern in any custody case is the best interests of the child." ***M.J.N., supra*** at 112 (citation omitted). The best-interests standard is decided on a case-by-case basis and considers all factors that have an impact on the child's physical, intellectual, moral and spiritual well-being. ***See id.*** A trial court must consider the following factors:

> **§ 5328. Factors to consider when awarding custody.**
>
> **(a) Factors.**—In ordering any form of custody, the court shall determine the best interest of the child by considering all relevant factors, giving weighted consideration to those factors which affect the safety of the child, including the following:
>
> (1) Which party is more likely to encourage and permit frequent and continuing contact between the child and another party.
>
> (2) The present and past abuse committed by a party or member of the party's household, whether there is a continued risk of harm to the child or an abused party and which party can better provide adequate physical safeguards and supervision of the child.

---

addition, with regard to issues of credibility and weight of the evidence, this Court must defer to the trial judge who presided over the proceedings and thus viewed the witnesses firsthand. However, we are not bound by the trial court's deductions or inferences from its factual findings. Ultimately, the test is whether the trial court's conclusions are unreasonable as shown by the evidence of record. We may reject the conclusions of the trial court only if they involve an error of law, or are unreasonable in light of the sustainable findings of the trial court.

***M.J.N. v. J.K.***, 169 A.3d 108, 111–13 (Pa. Super. 2017) (citations omitted).

(2.1) The information set forth in section 5329.1(a)(1) and (2) (relating to consideration of child abuse and involvement with protective services).

(3) The parental duties performed by each party on behalf of the child.

(4) The need for stability and continuity in the child's education, family life and community life.

(5) The availability of extended family.

(6) The child's sibling relationships.

(7) The well-reasoned preference of the child, based on the child's maturity and judgment.

(8) The attempts of a parent to turn the child against the other parent, except in cases of domestic violence where reasonable safety measures are necessary to protect the child from harm.

(9) Which party is more likely to maintain a loving, stable, consistent and nurturing relationship with the child adequate for the child's emotional needs.

(10) Which party is more likely to attend to the daily physical, emotional, developmental, educational and special needs of the child.

(11) The proximity of the residences of the parties.

(12) Each party's availability to care for the child or ability to make appropriate child-care arrangements.

(13) The level of conflict between the parties and the willingness and ability of the parties to cooperate with one another. A party's effort to protect a child from abuse by another party is not evidence of unwillingness or inability to cooperate with that party.

(14) The history of drug or alcohol abuse of a party or member of a party's household.

(15) The mental and physical condition of a party or member of a party's household.

(16) Any other relevant factor.

23 Pa.C.S. § 5328(a)(1)-(16). At issue in the instant case are subsections (2), relating to instances of abuse alleged against Stepmother and (7), Child's preference as to which household he lives in, given his maturity level and ability to make sound judgments.

## III.

### A.

Mother first argues the trial court erred in granting Father's motion *in limine* limiting testimony concerning the incident forming the basis of the DSS investigation of Stepmother.[2] Mother maintains the court should have permitted evidence from the school officials, social workers and police officers who investigated the abuse to corroborate Child's version of the episode, as Stepmother did not simply "pop him" in the mouth.

As noted, Mother's contention challenges the court's assessment under Section 5328(2). The trial court explained its reasons for limiting the testimony as follows:

> The Court granted the Motion *in Limine* due to the fact that hearings had occurred and an order had been stipulated to in

---

[2] A trial court's ruling on a motion *in limine* is subject to an evidentiary abuse of discretion standard of review. **See In re Fiedler**, 132 A.3d 1010, 1023 (Pa. Super. 2016).

South Carolina, ending the child abuse case. There was a report from the Child's counselor stating that there should be no testimony or questions, at all. The only two individuals who could testify to the incident were the child and the stepmother, in that regard, this Court overruled the Motion *in Limine* and allowed Child and Stepmother to be fully cross-examined. For everyone else involved, the testimony would be hearsay, or secondhand from those two primary witnesses, along with the fact the testimony would have had to occur by telephone, making it more difficult to judge credibility. This Court having the two primary direct sources for testimony (Stepmother and Child), it granted the Motion *in Limine* disallowing other people who heard statements from either person. Further, the Court would state if it was in error granting that Motion *in Limine*, the result was clearly harmless in that this Court found as a fact Stepmother slapped the child and left a mark, which amounted to child abuse.

\* \* \*

The Court found the remainder of the abusive allegations leveled by Mother against Stepmother, and to which the child testified, to not be credible. This court specifically believes that the child exaggerated, or told falsehoods on those other issues, as he had been coached by his mother. This finding was mostly derived from watching Child's live testimony, his expression and inflection. . . . All parties testified to a tense telephone call in March where Mother was asking and demanding the child make a decision on custody. This was extremely emotionally upsetting to the child. . . . This Court believes that Mother has caused as much if not more of the child's difficulties this last year by her insistence on changing custody and demanding the child agree, than does Stepmother.

(Trial Ct. Op., at 2-3).

The record supports the trial court's finding that although Stepmother's actions were inappropriate during the incident, she had taken responsibility for her mistake and participated in individual and family counseling in an effort to prevent such episodes in the future. The DSS investigation had concluded

at the time of the custody trial and it had been discontinued with the consent of all parties.

Furthermore, the trial court **did allow** extensive testimony regarding the incident from both Child and Stepmother and it considered their descriptions of what had occurred. Father also detailed his observations regarding the demeanors of Child and Stepmother and the mark resembling rug burn on Child. The trial court also specifically found Child's additional allegations of abuse years earlier, such as throwing a handful of matchbox cars either exaggerated or not credible and we "must defer to the trial judge who presided over the proceedings and thus viewed the witnesses firsthand." ***M.J.N., supra at*** 112. Because it heard testimony from all the witnesses with firsthand knowledge of the event, the trial court did not abuse its discretion in limiting testimony regarding the already-concluded DSS matter.

**B.**

Mother next contends the trial court failed to appropriately weigh Child's stated preference to reside with her in Pennsylvania during the school year. She challenges the court's assessment of the custody factor mandating that it consider the well-reasoned preference of Child at Section 5328(a)(7) and claims the court disregarded Child's wishes because of her past drug use.

"The preference of a child in a custody case, although not controlling, is a factor to be carefully considered as long as it is based on good reasons." ***Swope v. Swope***, 689 A.2d 264, 266 (Pa. Super. 1997) (citation omitted).

"The child's maturity and intelligence must be considered, and the weight to be given the child's preference can best be determined by the judge before whom the child appears." *Id.* (citation omitted).

In this case, after considering the witness' testimony and assessing their credibility, the trial court determined that living with Mother during the school year was not in Child's best interests. It reasoned that Mother's life was very unstable from 2014-2018, and while she "has made great strides in recovery, she is still very early in the recovery process." (Trial Ct. Op., at 4).

The record supports the trial court's findings and we discern no abuse of discretion in its decision. Child has resided and attended school in South Carolina for several years and is involved in the community and with extended family. Although Child's preference to live with Mother was not determinative, the record reflects that this factor was nevertheless considered by the trial court.

**C.**

Finally, Mother challenges the trial court's *sua sponte* transfer of jurisdiction of the case to South Carolina pursuant to the Uniform Child Custody Jurisdiction and Enforcement Act (UCCJEA).[3] Mother maintains that although the court may decline to exercise jurisdiction on its own motion if it

_____

[3] 23 Pa.C.S. § 5401-5482.

determines that it is an inconvenient forum, it must first allow the parties an

opportunity to submit information relevant to the enumerated factors it must

consider in rendering its decision under Section 5427(b) of the UCCJEA.[4]

_____

[4]    **§ 5427. Inconvenient forum.**

**(a) General rule.**—A court of this Commonwealth which has jurisdiction under this chapter to make a child custody determination may decline to exercise its jurisdiction at any time if it determines that it is an inconvenient forum under the circumstances and that a court of another state is a more appropriate forum.  The issue of inconvenient forum may be raised upon motion of a party, the court's own motion or request of another court.

**(b) Factors.**—Before determining whether it is an inconvenient forum, a court of this Commonwealth shall consider whether it is appropriate for a court of another state to exercise jurisdiction. For this purpose, **the court shall allow the parties to submit information and shall consider all relevant factors, including**:

(1) whether domestic violence has occurred and is likely to continue in the future and which state could best protect the parties and the child;

(2) the length of time the child has resided outside this Commonwealth;

(3) the distance between the court in this Commonwealth and the court in the state that would assume jurisdiction;

(4) the relative financial circumstances of the parties;

(5) any agreement of the parties as to which state should assume jurisdiction;

(6) the nature and location of the evidence required to resolve the pending litigation, including testimony of the child;

In contrast, the trial court and Father contend that this issue is not ripe for review, as the court has not yet entered an order transferring jurisdiction of the case. Rather, the order appealed from merely states the court's intention to: "within thirty days of this Order being finalized, the Court, on its own motion, will transfer this case to Saluda County, South Carolina, with Father bearing the costs of the transfer." (Order, 7/29/20, at 2).

The ripeness doctrine is a prerequisite for a court to exercise review and address the merits of a case. *See Treski v. Kemper Nat. Ins. Companies*, 674 A.2d 1106, 1113 (Pa. Super. 1996). "To be ripe, an actual case or controversy must exist at every stage of the judicial process." *Id*. (citation omitted). The rationale behind the doctrine is to prevent premature adjudication of a claim. *See id.*

While the trial court has not actually entered a transfer order, it did indicate that it was going to transfer jurisdiction within "thirty days of the order being finalized." While the order had not yet been entered, it had the effect of bifurcating the proceeding to require a second proceeding and probably a second appeal. The relevant statutory language expressly requires

---

(7) the ability of the court of each state to decide the issue expeditiously and the procedures necessary to present the evidence; and

(8) the familiarity of the court of each state with the facts and issues in the pending litigation.

23 Pa.C.S. § 5427(a),(b)(1)-(8) (emphasis added).

the court to allow the parties to submit information pertinent to the enumerated factors before it enters such order. ***See*** 23 Pa.C.S. § 5427; ***See also J.C. v. K.C.***, 179 A.3d 1124, 1133–34 (Pa. Super. 2018) (determining trial court must perform its mandated responsibilities under the UCCJEA, including the requirement that it **shall** allow the parties to submit information relevant to the enumerated factors to determine an inconvenient forum). Accordingly, the matter is remanded to the trial court to allow the parties to submit information regarding whether the matter should be transferred.

Custody order affirmed. Case remanded for consideration of whether custody matter should be transferred to Saluda County, South Carolina. Jurisdiction Relinquished.

Judgment Entered.

Joseph D. Seletyn, Esq.
Prothonotary

Date: 5/13/2021